IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

           Plaintiff,

vs.                                        **Case No. 04-40159-01-RDR**

EMIGDIO HERNANDEZ-BUSTOS,

           Defendant.

---

**MEMORANDUM AND ORDER**

The court has conducted a hearing on the pending pretrial motions. The court has also allowed the parties to file additional briefs. Having reviewed all of the evidence and arguments, the court is now prepared to rule.

The defendant is charged, along with Abelardo Hernandez-Hernandez, in a one-count indictment. They are charged with possession with intent to distribute approximately ten pounds of methamphetamine in violation of 21 U.S.C. § 841(a)(1). The co-defendant has entered a plea of guilty.

The charge arises from a traffic stop on November 29, 2004 in Russell County, Kansas on Interstate 70 by Russell County Sheriff's Deputy Kelly Schneider. Deputy Schneider allegedly stopped the defendant for speeding. He then gave the defendant a warning ticket. He then requested consent to search. He alleges that the defendant and the passenger gave consent to search. Subsequently, after some dismantling of the vehicle,

methamphetamine was discovered.

The defendant has filed two motions: (1) motion to dismiss based on racial profiling; and (2) motion to suppress evidence and statements.

**MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

The defendant contends that the evidence obtained from the traffic stop should be suppressed because he (1) was illegally stopped; (2) was unlawfully detained; and (3) did not provide consent to search. He argues that he was illegally stopped because he was stopped based on racial profiling, not because he was speeding. He asserts he was illegally detained because he was asked questions after the warning citation was issued. He contends that the officer lacked reasonable suspicion to continue to detain him. Finally, he asserts that he did not consent to the search of the vehicle. He notes that he speaks only Spanish and Deputy Schneider speaks only English. He suggests that he did not knowingly and voluntarily consent to a search of the vehicle.

*Findings of Fact*

1. On November 29, 2004, Russell County Deputy Sheriff Kelly Schneider was patrolling Interstate 70. At approximately 12:43 p.m., Deputy Schneider saw a green Ford Windstar van traveling eastbound. He was traveling westbound on the four-

2

lane highway at the time. Using his radar, he determined the van was traveling at a speed of 75 miles per hour. The posted speed limit was 70 miles per hour. Deputy Schneider believed the van was traveling too fast for the road conditions. He noted that other vehicles were traveling between 60 and 65 miles per hour. The weather was cold and windy. Deputy Schneider had worked three accidents that morning that were related to road conditions. There had been ice on the roads in the morning, but by the afternoon the roads were mostly slushy. Deputy Schneider turned around in the median and eventually caught the van. He turned on his emergency lights and the van immediately pulled over to the side of the road. The events that occurred following the stop were recorded by a video camera located in Deputy Schneider's patrol car. The camera has audio capabilities and it recorded most of what was said by the individuals involved.

    2. Deputy Schneider has been with Russell County Sheriff's Department since 1999. He has been actively engaged in illegal drug interdiction since that time. He had previously worked at the Osborne County Sheriff's Department since 1986. During his employment with the Russell County Sheriff's Department, he has obtained considerable knowledge on the transportation of illegal drugs. He has been involved in over 170 traffic stops where

illegal drugs have been found since 1999.

3.  Deputy Schneider was not able to clearly see the occupants of the van when he first noticed it.  He did briefly notice the driver, but he was unable to determine the driver's race or ethnicity.  He also did not drive up to the side of the van, as he sometimes does in the interests of his personal safety, prior to attempting to stop it.  Thus, he was unaware of who was driving the van until he approached the van after he stopped it.

4.  Deputy Schneider approached the van from the passenger side.  After the passenger rolled down the window, Deputy Schneider immediately told the driver that he needed to slow down.  He stated:  "You need to slow down.  You're running 75 miles an hour out here on ice.  You're going to wreck.  Slow down."  At that time, Deputy Schneider became aware the occupants of the van were Hispanic.  He sought the driver's license of the driver.  He then began to ask about the occupants' travel plans.  He asked them where they were going.  The passenger replied that they were going to North Carolina.  Deputy Schneider then asked where they had been.  The passenger told him they had gone to Phoenix, Arizona to look for work.  He said they had been there for two days.  Deputy Schneider asked the driver if this was his van.  The driver said yes.  He then

asked the driver for the registration.  The driver had previously given Deputy Schneider a North Carolina driver's license that identified him as Emigdio Hernandez-Bustos.  The passenger was identified as Abelardo Hernandez-Hernandez.  The registration showed that the owner of the van was Hernandez-Bustos.  Hernandez-Bustos did some talking, but most of the talking was done by Hernandez-Hernandez, who appeared to have a better understanding of English.

    5.  Deputy Schneider returned to his patrol car and checked Hernandez-Bustos' license.  He then wrote a warning ticket.  Deputy Schneider returned to the car, again on the passenger side, and returned the driver's license and registration to Hernandez-Bustos.  He also provided him with a copy of the warning ticket.  As he handed him the warning ticket, Deputy Schneider said:  "A warning.  Slow down.  Pay no money-no dinero.  Okay.  Slow down.  Wreck."  Hernandez-Hernandez asked him what the speed limit was.  Deputy Schneider told him it was 70 miles per hour.  Deputy Schneider then said, "Alright.  Be careful."  He took one step away from the van and one step towards his patrol car and said, "Hey, can I ask another question?"  Hernandez-Hernandez answered:  "Yeah."  Deputy Schneider then said:  "I see a lot of illegal contraband up here, marijuana, cocaine, pistols.  You don't have anything like

that, do you?" Hernandez-Hernandez replied: "No, no." Deputy Schneider then asked: "Can I look in the van?" Hernandez-Hernandez repeated the question to Hernandez-Bustos in Spanish. Both occupants then said yes. When he asked for consent to search, Deputy Schneider used a normal conversational tone. He did not use any threats or coercion. He did not touch or point to his gun.

    6. Deputy Schneider then asked both occupants to step out of the van. They did so and Deputy Schneider began searching. After some initial looking and probing, he determined the van had a false compartment. He had found false compartments on other Windstar vans. In the 60 to 70 cases where he has found false compartments in vehicles, ninety-five percent contained illegal drugs. He directed Hernandez-Bustos to follow him. Hernandez-Hernandez rode with him in the patrol car. Deputy Schneider radioed for another officer to follow the van.

    7. Deputy Schneider led Hernandez-Bustos and the van to the sheriff's office in Russell, Kansas. Deputy Schneider took the front seats out and located a false compartment that contained 10.35 pounds of methamphetamine. Hernandez-Bustos made no objections to the search at the side of the road or at the sheriff's office. Hernandez-Bustos and Hernandez-Hernandez were then arrested.

*Conclusions of Law*

1. A traffic stop is a seizure coming within the purview of the Fourth Amendment to the United States Constitution. United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc), cert. denied, 518 U.S. 1007 (1996). The principles of Terry v. Ohio, 392 U.S. 1 (1968) apply to traffic stops. Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably justified related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20.

2. During a routine traffic stop, the detaining officer is permitted to ask such questions, examine such documentation, and run such computer verifications as necessary to determine that the driver has a valid license and is entitled to operate the vehicle. United States v. Miller, 84 F.3d 1244, 1250 (10th Cir.), cert. denied, 519 U.S. 985 (1996). The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning. United States v. Martinez, 983 F.2d 968, 974 (10th Cir. 1992), cert. denied, 508 U.S. 922 (1993). However, if the officer wants to detain the driver for further questioning, he may do so if "(1) 'during the course of the traffic stop the

officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity;' or (2) 'the driver voluntarily consents to the officer's additional questioning.'" United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997) (quoting United States v. Sandoval, 29 F.3d 537, 540 (10th Cir. 1994)).  If the officer continues to question the driver in the absence of either of these two circumstances, then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms." Id. (internal quotations and citation omitted).

3.  The first inquiry usually involves the validity of the initial stop.  Here, Hernandez-Bustos has not disputed that he was speeding.  The court found Deputy Schneider's testimony credible that the van was speeding and that he was unaware of the race or ethnicity of the occupants prior to stopping it. The court shall discuss the racial profiling aspect of the defendant's motion in more detail later in this opinion, but for purposes of this motion, the court finds there was probable cause for the initial stop.

4.  The court must next determine if the encounter that led to the alleged consent to search was consensual.  "In determining whether a driver and police officer are engaged in a consensual encounter in the context of a traffic stop, there

are few, if any, bright-line rules." Elliott, 107 F.3d at 813. Rather, we must consider "the totality of the circumstances in a particular case." Id. at 814. While the return of documents, such as a driver's license or other personal papers, is a prerequisite to an encounter becoming consensual, the Tenth Circuit has acknowledged it "is not always sufficient to demonstrate that an encounter becomes consensual." Id.; see also United States v. Gregory, 79 F.3d 973, 979 (10th Cir. 1996). Accordingly, even after the officer returns a driver's papers, the encounter may not be consensual where "there was evidence of a 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.'" Elliott, 107 F.3d at 814 (quoting United States v. Turner, 928 F.2d 956, 959 (10th Cir. 1991)). However, the ultimate test is whether "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." United States v. McKneely, 6 F.3d 1447, 1451 (10th Cir. 1993).

10.   The court finds that the encounter between Deputy Schneider and the occupants of the van after Hernandez-Bustos' documents were returned was consensual. The defendants were confronted with one officer who did not physically touch them or

9

their vehicle, and did not display his weapon or use a commanding tone of voice.  In a conversational tone, Deputy Schneider told Hernandez-Bustos and Hernandez-Hernandez, after he returned the documents, "Alright.  Be careful."  He then asked them if he could ask another question.  They readily agreed.  Thus, there was voluntary cooperation by them to the non-coercive questioning by Deputy Schneider.  The court concludes that the totality of the circumstances indicates that the encounter after the return of the documents was consensual.

11.  With the conclusion that the encounter was consensual, we must consider whether Hernandez-Bustos consented to a search of the van.  A defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant.  See Schneckloth v. Bustamonte, 412 U.S. 218, 235 (1973).  The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue.  United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001).  The government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given.  Id.

12.  The facts support the conclusion that consent to search

the van was voluntarily given.  There is no evidence of any coercion or duress.  There was no evidence that Deputy Schneider threatened the occupants, used a hostile voice, touched them or displayed his gun.  The defendants quickly agreed to allow Deputy Schneider to search the van after he asked.  There was no evidence to dispute Deputy Schneider's testimony that Hernandez-Hernandez asked Hernandez-Bustos in Spanish if Deputy Schneider could look in the van.  Hernandez-Bustos answered yes after the translation and then made no objection during the search.  The totality of the circumstances indicates that Hernandez-Bustos voluntarily consented to a search of the van.

13.  Based upon the foregoing determinations, the court must deny defendant's motion to suppress.

**MOTION TO DISMISS BASED ON RACIAL PROFILING**

The defendant contends that he was stopped based on racial profiling because he is Hispanic.  The defendant argues that he is entitled to discovery on this issue and a further hearing. He asserts that he has demonstrated some evidence of selective enforcement of the traffic laws through the submission of a variety of materials.  At the hearing on the motion to suppress, defendant did not present any live testimony.  Rather, the defendant chose to submit a number of documents, most of which had already been submitted to other courts in support of racial

11

profiling arguments.  Included in these documents are (1) the 2003 Lamberth study, a study commissioned by the Kansas legislature to survey traffic stops during four months in 2002 by seven law enforcement agencies in Kansas; (2) a study of the files of the Federal Public Defender (FPD) for the District of Kansas for the period from January 2001 to April 22, 2003 showing individuals stopped for traffic offenses on Kansas interstate highways who were later charged with drug offenses; (3) statistical tables showing the traffic stops of various officers with the Russell County Sheriff's Department, including Deputy Schneider, during the years from 2000 to 2004; (4) a comparison of Kansas Highway Patrol traffic stops to the stops of Deputy Schneider; and (5) a transcript of the motions hearing held on July 31, 2003 in United States v. Mesa-Roche, No. 02-40151-01-JAR and United States v. Lindsey, No. 03-40011-01-JAR.

The thrust of the defendant's argument is that Deputy Schneider has a practice of targeting Hispanic drivers for traffic stops.  The defendant points primarily to the evidence compiled by Russell County showing that Deputy Schneider has issued warnings and citations to Hispanic drivers in "extraordinarily high percentages."  The defendant notes that Deputy Schneider stopped Hispanic drivers in the following percentages:   2002--34%;  2003--23%;  and  2004--17%.   The

defendant further points out that, of the vehicles that Deputy Schneider searched, Hispanic drivers were involved as follows: 2002--44%; 2003--35%; and 2004--31%.  Against these numbers, the defendant notes the Lamberth study indicated that only 1.8% of the travelers on I-70 are Hispanic.  The defendant also notes the percentage of Hispanics whom the other officers in Russell County gave citations or warnings is much smaller than the percentages of Deputy Schneider.  The defendant believes these statistics show that Deputy Schneider targeted vehicles driven by Hispanics for stopping and for searching.

As noted previously, most of the information submitted by the defendant has been presented to and considered in exacting detail by other judges in this district:  (1) Judge Robinson in United States v. Mesa-Roche, 288 F.Supp.2d 1172 (D.Kan. 2003) and United States v. Duque-Nava, 315 F.Supp.2d 1144 (D.Kan. 2004) and (2) Judge Crow in United States v. Alcaraz-Arellano, 302 F.Supp.2d 1217 (D.Kan. 2004).  In those cases, Judge Robinson and Judge Crow denied the defendants' motions and found the evidence insufficient to justify any additional discovery on the issue of racial profiling.

At the hearing on the instant motion, Deputy Schneider provided some testimony that had not previously been considered by Judge Robinson or Judge Crow.  He noted the number of

Hispanics traveling through Russell County on I-70 was perhaps greater than other highways in Kansas because several highways from communities with large Hispanic populations intersect I-70 at various points in the vicinity of Russell County.  He also noted that Highway 54, which intersects one of the highways that intersects I-70, is a "major corridor for a lot of Hispanics and aliens--illegal aliens to enter the United States" because it is the shortest route from Tucson, Arizona to Kansas City.  Deputy Schneider also explained the methodology behind the compilation of the statistics for all of the deputies in the Russell County Sheriff's Department.  He noted the figures in those tables involved only stops where he gave the driver a written warning or citation.  He also noted the decision to classify the race of a particular driver was a subjective one by each deputy and was not an exact science.  Finally, he noted that other deputies in Russell County did not engage in the same duties that he did. He noted they did not patrol I-70 as much as he did or make nearly as many traffic stops.  Deputy Schneider indicated he never stopped any driver based upon his race or ethnicity.  He testified that only in "very, very few" instances does he know the race or ethnicity of the person he is stopping before he makes the decision to stop.  He also indicated that in his formal training in drug interdiction, he was not taught that

race is an indicator of drug trafficking, and that when instructing others, he does not teach that race is such an indicator.

In considering the defendant's motion, the court must apply the following standards:

> A defendant claiming unequal enforcement of a facially neutral statute must show both that the enforcement had a discriminatory effect, and that the enforcement was motivated by a discriminatory intent. In order for a defendant to obtain discovery on these issues, the defendant need not establish a prima facie case of selective enforcement.  Nevertheless, given the heavy burden that discovery can impose on the government, the showing necessary to obtain discovery for a selective prosecution defense must "itself be a significant barrier to the litigation of insubstantial claims."  A defendant who claims he was targeted for enforcement of traffic laws because of race or ethnicity is entitled to discovery on that claim only if he presents "some evidence tending to show the existence of the essential elements of the [selective enforcement] defense, discriminatory effect and discriminatory intent."  A defendant cannot obtain discovery based on a bald, unsupported allegation of selective enforcement.  Granting discovery subjects the governmental agency to considerable expense of time and money in gathering records, and obviously diverts its energy from its mission of law enforcement.  Thus, the defendant must make some showing of discriminatory effect and discriminatory intent.

Duque-Nava, 315 F.Supp.2d at 1152-53 (footnotes omitted).

To establish discriminatory effect, a claimant must show that the law was enforced against him, but not similarly situated individuals of other races.  United States v. Armstrong, 517 U.S. 456, 465 (1996); Duque-Nava, 315 F.Supp.2d

at 1153.  Discriminatory effect can be shown by either showing a similarly situated individual or through the use of statistical evidence.  <u>Marshall v. Columbia Lea Regional Hospital</u>, 345 F.3d 1157, 1168-69 (10th Cir. 2003).  Statistics and circumstantial evidence also may be utilized to create an inference of discriminatory purpose, but rarely will statistics alone be sufficient to establish discriminatory intent.  <u>Duque-Nava</u>, 315 F.Supp.2d at 1161-62.  Discriminatory purpose implies more than intent as awareness of consequences, and implies that the decision maker selected or reaffirmed a particular course of action at least in part "because of" rather than "in spite of" its adverse effects on an identifiable group.  <u>Id</u>. at 1160-61 (citations omitted).

     The court is not persuaded that the defendant has made a sufficient showing of discriminatory effect.  The court is convinced that the evidence offered by the defendant has so many problems that it cannot be relied upon to establish discriminatory impact.  Judge Crow determined that the Lamberth study was so flawed that it could not be relied upon to establish discriminatory effect in a case involving a stop by Deputy Schneider.  <u>Alcaraz-Arrellano</u>, 302 F.Supp.2d at 1228-1232.  He determined that the study was irrelevant and unreliable because (1) it states nothing about Russell County or

16

Deputy Schneider; (2) the benchmark data is not sufficiently reliable; (3) the stop data lacks trustworthiness; (4) it fails to rule out alternate explanations; and (5) it does not identify similarly situated individuals.  Id.  He also found that the other statistical evidence, including the reports showing stops by Russell County deputies, including Deputy Schneider, and the report of the Federal Public Defender's officer were also faulty for several reasons.  Id. at 1232-33.  Judge Robinson examined much of the same evidence.  It appears that she examined virtually the identical evidence that is presently before this court and determined that, although the evidence had flaws, it did sufficiently demonstrate discriminatory effect.  Mesa-Roche, 288 F.Supp.2d at 1189-90; Duque-Nava, 315 F.Supp.2d at 1159.  This court is inclined to follow the analysis of the evidence by Judge Crow.  As pointed out by the government, this evidence suffers from a variety of problems.  At first glance, it appears to show discriminatory effect or disparate treatment.  However, upon closer inspection, the various defects in this evidence overcome its use as reliable evidence in support of a finding of discriminatory effect.

Even if the court were persuaded that the evidence showed discriminatory effect, we cannot find that the defendant has made an adequate showing of discriminatory intent.  The court

17

has found that Deputy Schneider did not know the race or ethnicity of the occupants of the van prior to the stop. The significance of this finding is noted by Judge Crow in <u>Alcaraz-Arrellano</u>: "Without proof of the officer's knowledge of a driver's race, an intent to discriminate against a driver because of his race can rarely, if ever, be shown." 302 F.Supp.2d at 1234. Moreover, there is no evidence that Deputy Schneider exhibited any discriminatory behavior towards the occupants of the van on this occasion or towards any other persons he has previously stopped. Under these circumstances, the court fails to find sufficient non-statistical evidence to demonstrate discriminatory intent. Accordingly, the court finds that the defendant has not demonstrated a prima facie showing of selective enforcement and is not entitled to any additional discovery. The defendant's motion to dismiss based upon racial profiling must be denied.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress evidence and statements (Doc. # 34) be hereby denied.

**IT IS FURTHER ORDERED** that defendant's motion to dismiss complaint/case based on racial profiling (Doc. # 33) be hereby denied.

**IT IS SO ORDERED.**

Dated this 12th day of July, 2005 at Topeka, Kansas.

```
                         s/Richard D. Rogers
                         United States District Judge
```